ORDERED.

**Dated:  May 04, 2016**

K R May

K. Rodney May
United States Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION
www.flmb.uscourts.gov

In re

Thomas Allen Chesley,                              Case No. 8:11-bk-13785-KRM
                                                   Chapter 7
        Debtor,
_____/

Guy G. Gebhardt,
Acting United States Trustee,

        Plaintiff,

v.                                                 Adv. No. 8:14-ap-490-KRM

Thomas Allen Chesley,

        Defendant.
_____/

**MEMORANDUM OPINION AND JUDGMENT ON
UNITED STATES TRUSTEE'S OBJECTIONS TO DISCHARGE**

        This consumer bankruptcy case was commenced nearly five years ago, on July 21, 2011

(the "Petition Date").[1]  Less than two months before the Petition Date, Mr. Chesley ("Debtor")

_____

[1]  The bankruptcy case was originally assigned to Judge McEwen, but it was reassigned to the above-signed judge
on January 8, 2014.  Hereinafter Case No. 8:11-bk-13785-KRM will be cited as the "Main Case."  Citations to
filings in the bankruptcy case will be "Main Case, Doc. No. ___."  Citations to filings in this adversary proceeding
will be "Doc. No. ___."  References to the trial transcript and exhibits will be cited as "Trial Tr. vol. ___" and
"Ex. __."

received about $336,644 from settling a personal injury claim.[2]  That would have paid a substantial amount of the debts he owed.  Another $340,000 from the settlement was transferred to his attorney's trust account to cover an unliquidated amount of legal fees.  In the two months leading to the bankruptcy filing, Debtor spent about 90% of the settlement proceeds he had received to satisfy a foreclosure judgment on his home, pay certain debts, and acquire a truck, a motorcycle and assets related to his boat racing activities.  Some of these transactions and assets were never disclosed; others were not disclosed for more than a year into the case.

The Office of the United States Trustee ("UST") filed this adversary proceeding alleging that Debtor deliberately transferred and concealed assets, with the intent to hinder, delay or defraud creditors, in violation of §727(a)(2) of the Bankruptcy Code.[3]  The UST also alleges that Debtor violated §§727(a)(3)-(5), by making false oaths in his required bankruptcy filings, with the intent to conceal his interests in assets, by failing to keep and preserve records, and by failing to explain satisfactorily the disposition of assets prior to the bankruptcy filing.

Debtor, appearing *pro se*, disputes only some of the relevant facts.  Instead, he advances several arguments to excuse his conduct.  He argues, for example, that the pre-bankruptcy expenditures were justifiable because they were made to resolve debts, repair his home, and save it from foreclosure; that he did not "legally" own the open sea racing boat or the motorcycle which were never disclosed in his bankruptcy schedules; that he has not committed fraud; and that his attorneys are responsible for what was set forth in the multiple versions of his Bankruptcy Schedules ("Schedules") and Statement of Financial Affairs ("SOFA").

---

[2]  Doc. No. 1 at ¶ 5.

[3]  Unless otherwise stated, all statutory references are to the Bankruptcy Code, 11 U.S.C. §§ 101 *et seq.*  Section 727(c) of the Bankruptcy Code provides the UST with standing to object to the Debtor's discharge.  Bankruptcy Rule 7001(4) instructs that an objection to discharge must be brought as an adversary proceeding.

The Court conducted a three-day trial and heard the testimony of five witnesses.[4]  For the reasons stated below, after considering the record and credibility of witnesses, the Court concludes that the Debtor should be denied a Chapter 7 discharge.

## BACKGROUND FACTS

The following summary, including references to filings in the Main Case, represents the Court's findings of fact in this proceeding.

### The 2011 Personal Injury Settlement

In 2005, Debtor was involved in an automobile accident involving a Parts Depot, Inc. truck.  After a jury verdict for Debtor, Parts Depot settled the claim in exchange for Debtor's general release.[5]  In May of 2011, Debtor received $336,643.56 directly, which he deposited into two accounts at SunTrust Bank.[6]  Another $340,000 was transferred to one of Debtor's personal injury attorneys, Mr. Chanfrau, subject to multiple attorneys' charging lien claims.[7]

### Pre-Bankruptcy Assets and Expenditures

Debtor expended 90% of the settlement proceeds (about $304,446) in less than two months, in multiple transactions including the following:

> (1)  On June 2, 2011, Debtor purchased a new Ford F-450 truck (the "Truck") for $63,077.[8]  Debtor paid the dealer approximately $53,000, by check from his SunTrust account, and obligated himself on a note for the $10,077 balance.[9]

---

[4]  Attorney John Campbell, Attorney Herbert R. Donica, Chapter 13 Trustee and former Chapter 13 staff attorney, Kelly Remick, UST analyst, Jill Sox, and Debtor.

[5]  Trial Tr. vol. 092115, 80:22 – 82:8, Sept. 21, 2015; Pl.'s Ex. 203, par. II. a; Pl.'s Ex. 26.

[6]  Doc. No. 162 at 4; Trial Tr. vol. 093015, 116:8-21, Sept. 30, 2015.

[7]  Doc. No. 162 at 4 (citing Pl.'s Ex. 203, par. II. b.; Pl.'s Ex. 26).

[8]  Doc. No. 1 at ¶ 8.

[9]  *Id*; Doc. No. 162 at 5 (citing Pl.'s Ex. 203, par. II. e.)

(2)  On June 2, 2011, Debtor paid about $116,655 to Greentree Financing to satisfy a foreclosure judgment on his home; on the Petition Date, the house had a value, per Debtor's Amended Schedules, of no more than $62,000.[10]

(3)  Debtor spent an estimated $19,782 for his boat racing activities, including $9,999.32 for the purchase, on July 5, 2011, of an outboard motor for his 29' racing boat (the "Warlock")[11] and $3,500 for the purchase, on June 2, 2011, of a tow trailer from "Tim Nobles Trailers."[12]

(4)  Debtor spent between $27,786 and $38,000 on house repairs or improvements.[13]

(5)  Debtor paid some $20,500 to certain of his creditors, including $4,500 to his girlfriend.[14]  Debtor also paid $1,500 to his father, Harry Hammons ("Hammons") and loaned Hammons $3,500.[15]

(6)  On June 24, 2011, Debtor withdrew $7,500 from his SunTrust accounts.[16]  On June 26, 2011, he paid $1,500 cash to acquire a 2002 Indian Scout Motorcycle (the "Motorcycle").[17]

(7)  Debtor made cash withdrawals and expenditures totaling about $39,008, characterized by the UST's analyst, as "food," "general retail," and "unknown."[18]

As a result, only $32,198 remained in Debtor's bank accounts on the Petition Date.[19]

---

[10]  Debtor's original Schedules (Main Case, Doc. No. 14), and the first amended Schedules (Main Case, Doc. No. 67) both list the value of the homestead at $75,000.  But, on the second amended (Main Case, Doc. No. 131) and fourth amended (Main Case, Doc. No. 306), Debtor revised the value of his homestead to be $61,931.

[11]  Doc. No. 162 at 5 (citing Pl.'s Ex. 193; Trial Tr. vol. 093015,133:21-134:21; Pl.'s Ex. 203, par. II.l.).

[12]  Pl.'s Ex. 171; Trial Tr. vol. 092115, 206:10- 207:9.

[13]  The UST estimated these expenses at $27,786 and characterized some of them as improvements.  Debtor concedes that the amount may be as much as $38,000, but says they were for "repairs."  Doc. No. 162 at 4-5 (citing Pl.'s Ex. 193; Trial Tr. vol. 093015, 128:15-21; Trial Tr. vol. 092115, 177:14-178:5).

[14]  *Id.* at 6 (citing Pl.'s Ex. 203, par. II.d; Pl.'s Ex. 193; Trial Tr. vol. 093015, 133:6-20).

[15]  Doc. No. 162 at 6 (citing Pl.'s Ex. 203, par. II.k.).

[16]  *Id.* (citing Pl.'s Ex. 203, par. II.j.).

[17]  *Id.* at 4-5 (citing Pl.'s Ex. 176; Trial Tr. vol. 091115, 146:12-151:15, Sept. 11, 2015).

[18]  *Id.* at 6 (citing Pl.'s Ex. 193, Trial Tr. vol. 093015, 138:13-139:10).

The Chapter 13 Case

Facing garnishment of his bank accounts by a creditor, Timothy Beahan,[20] Debtor filed for relief under Chapter 13 on July 21, 2011.[21]   At that time, Debtor owed substantial debts. Creditors eventually filed claims in the case totaling about $568,880.[22]

Debtor's initial Chapter 13 plan, original Schedules, and SOFA were filed on August 11, 2011.[23]  Debtor's plan called for payments of $3,418.90 per month for 60 months,[24] which would have totaled about $205,140, if all payments were made.

As it does in every Chapter 13 case, the Court entered a "debtor's duties" order on July 25, 2011, requiring Debtor to:  (1) provide information sufficient to enable the Chapter 13 trustee to verify the feasibility of his Chapter 13 plan, including the submission of pay stubs, advices, or other documentation of income sources; and (2) cooperate with the Chapter 13 trustee.[25]  The Chapter 13 trustee was unable to conduct the initial meeting of creditors  on September 20, 2011, because Debtor failed to provide information regarding the sources of his income.[26]  The

---

[19]  Trial Tr. vol. 093015, 146:6-13.

[20]  Mr. Beahan holds judgments against Debtor from 2007 and 2008 of $20,749 and $39,425, respectively, arising from a dispute over a boat owned by Beahan that Debtor repaired.  On May 23, 2011, Beahan obtained a writ of garnishment against Debtor's bank accounts.  On July 20, 2011, Beahan obtained final judgment on the writ.

[21]  Pl.'s Ex. 203, par. II.m

[22]  Pl.'s Ex. 192.  In his last schedules, filed after the passage of the bar date of April  8, 2014, Debtor scheduled $567,624 in claims.  Pl.'s Ex. 63; Main Case, Doc. No. 484; Trial Tr. vol. 093015, 104:24-105:6.

[23]  Pl.'s Ex. 5; Main Case, Doc. No. 14.

[24]  Main Case, Doc. No. 13.

[25]  Main Case, Doc. No. 6 ("No later than seven (7) days before the date first set for the meeting of creditors, the Debtor shall provide the Trustee with copies of *tax returns* for the two years preceding the petition date and copies of all pay stubs, advices, or *documentation of income sources* ("Payment Advices") for the six month period ending on the last day of the month preceding the month of the petition date . . . .  The Debtor and Debtor's counsel shall cooperate with the Trustee, both before and after Plan confirmation, as necessary to enable the Trustee to perform the Trustee's duties under the Bankruptcy Code.") (emphasis added).

[26]  Trial Tr. vol. 092115, 23:17-24:10.

Chapter 13 trustee filed a motion to dismiss the case on October 14, 2011.[27]  On October 17,

2011, Judge McEwen entered an order requiring Debtor to provide the requested tax returns and

documentation of income before November 8, 2011, the date of the rescheduled § 341 creditors'

meeting.[28]

On December 5, 2011, the Chapter 13 Trustee filed a Motion to Convert Case to Chapter

7 or in the Alternative to  Dismiss with a One Year Bar to Re-Filing, alleging that Debtor had

failed to correct his schedules, which constituted unreasonable delay prejudicial to creditors.[29]

Two days later, on December 7, 2011, Debtor filed amended Schedules and an amended SOFA,

after signing them in open court.[30]

In the midst of the Chapter 13 trustee's requests for income verification, Debtor's first

bankruptcy counsel, Mr. Galewski, moved to withdraw, which Debtor opposed.  The Court

deferred ruling until February 2012, to give Debtor time to get a plan confirmed.[31]  Mr. Galewski

was replaced on February 15, 2012, by Attorney Hancock who remained in the case until March

18, 2013, when he, too, was allowed to withdraw.[32]  In all, Debtor was represented by four

different bankruptcy attorneys, each of whom withdrew from the case.[33]

---

[27]  Main Case, Doc. No. 39.

[28]  Pl.'s Ex. 7; Trial Tr. vol. 092115, 26:18-27:8; Main Case, Doc. No. 41.

[29]  Main Case, Doc. No. 62.

[30]  Main Case, Doc. No. 67.

[31]  Pl.'s Ex. 6.

[32]  In his Motion to Withdraw, Attorney Hancock stated that "Counsel believes he is ethically unable to continue the representation of Debtor."  Main Case, Doc. No. 343 at ¶ 1.

[33]  Trial Tr. vol. 092115, 238:6-10.  Stan Galewski represented the debtor from the start of his case until February 7, 2012 (Main Case, Doc. No. 96); Dion R. Hancock represented the debtor from February 15, 2012 until March 18, 2013 (Main Case, Doc. No. 351); David W. Steen represented the debtor from May 20, 2013 until September 4, 2013 (Main Case, Doc. No. 438); and, Robert W. Bauer and Timothy C. Youngblood represented the debtor from October 4, 2014 until May 20, 2014 (Main Case, Doc. No. 632).

The unrebutted testimony of Kelly Remick, former staff attorney for the Chapter 13 trustee, and now a Chapter 13 trustee herself, is that Debtor never provided any document to verify his ability to pay $3,418.90 per month, as his plan required.[34]  Ultimately, the Chapter 13 trustee took what Ms. Remick characterized as the "unprecedented step" of concluding the meeting of creditors on April 2, 2013, after Debtor gave the following enigmatic testimony regarding his income:  *I babysit it.  I just keep it right in my pocket to keep it warm at night."*[35]

During the Chapter 13 case, Debtor objected to the fees of his pre-petition attorneys.[36] After trials on two of the claims, a compromise was reached among all parties, resulting in payments from Mr. Chanfau's trust account totaling $165,000, split among the three law firm claimants.[37]  This left net proceeds of about $175,000 from the escrowed funds, which the Chapter 7 trustee is holding.[38]

The Exemptions Dispute

On January 9, 2013, some eighteen months after the Petition Date, Debtor filed an amended Schedule C asserting that all funds he had received from the Parts Depot settlement are exempt "disability income benefits" under § 222.18, Fla. Stat.  The Chapter 13 trustee filed objections to these claims of exemption,[39] which the Court sustained, ruling that: (1) the settlement proceeds, including the remaining funds held in the attorney's trust account, were not

---

[34]  Trial Tr. vol. 092115, 59:5-13.

[35]  Trial Tr. vol. 092115, 58:23-59:13.

[36]  Main Case, Doc. Nos. 125 and 126.

[37]  Main Case, Doc. No. 308.  The Court approved the compromise on March 26, 2013.  Main Case, Doc. No. 384.

[38]  Main Case, Doc. No. 348.  On December 16, 2013, the Court entered an order directing that the $175,000 in the attorney's trust account be placed in a non-IOTA interest-bearing trust account by the Trustee's counsel until further order.  Main Case, Doc. No. 523 at ¶ 1.

[39]  Main Case, Doc. Nos. 314 and 315, filed on January 18, 2013 and January 22, 2013, respectively.

exempt because they were paid in exchange for a general release, not from any disability policy or under a designation as compensation for disability or lost wages; (2) for the same reason, the funds in Debtor's bank account as of the Petition Date were not exempt; and (3) the Truck was not exempt, except to the extent of $1,000, as permitted under Fla. Stat., § 222.25(1).[40]

The District Court affirmed on March 17, 2014, concluding that Debtor had not established that because the accident rendered him disabled, the settlement proceeds he received are therefore "disability income benefits" and, thus, exempt under § 222.18 Fla. Stat.[41]  Debtor's appeal was dismissed on March 10, 2015, after the Eleventh Circuit determined that the Debtor was appealing a non-final order.[42]  The earlier ruling by this Court remains valid, subject to further appellate review.

Conversion of the Chapter 13 Case to Chapter 7

On November 21, 2013, the Court granted the Chapter 13 trustee's December 5, 2011, motion to convert the case to Chapter 7.[43]  Susan K. Woodard was appointed as the Chapter 7 trustee (hereinafter, the "Trustee").

At a hearing on December 17, 2013, the Court directed Debtor to turn over to the Trustee all non-exempt property by December 30, 2013.[44]  After waiting another month, the Trustee filed a motion, on January 30, 2014, to compel Debtor to turn over assets with a request that the Court equitably surcharge the Debtor's $1,000 vehicle exemption to cover the anticipated extra charges

---

[40]  Main Case, Doc. No. 445 at ¶¶ 3-5.

[41]  Main Case, Doc. No. 603-2. The District Court also concluded that the "record is devoid of any support illustrating that the general release settlement contemplated the proceeds be derived from a disability insurance policy or to represent disability income benefits." *Id.* at 21-22.

[42]  Main Case, Doc. No. 705-1.

[43]  Main Case, Doc. No. 482.

[44]  Pl.'s Ex. 49; Main Case, Doc. No. 532.

from the towing company.  The Trustee alleged a lack of cooperation by Debtor, which Debtor disputed.[45]  The Court subsequently declined to grant the requested surcharge.[46]  Since then, Debtor has repeatedly accused the Trustee and her counsel of "lying," trying to "defraud" him, and other misconduct.[47]

Counsel for the Trustee, Mr. Donica, testified that everything the Trustee has done has been the subject of a dispute, leading to an extraordinary amount of administrative expenses.[48] The Trustee anticipates that she may be able to recover assets of no more than $240,000, subject to administrative expense claims that may exceed $197,250.[49]  Creditors may not receive a meaningful distribution.  Mr. Donica testified that because of Debtor's lack of cooperation, this was one of the worst cases in which he has been involved.[50]

---

[45] Main Case, Doc. Nos. 560 and 566.  The Trustee also filed an Application of Compensation of Auctioneer (Main Case, Doc. No. 641), to which Debtor objected on the basis that the District Court had instructed the Trustee not to disburse any funds from the sale of the Ford F-450 truck (Main Case, Doc. No. 645).  The Debtor raised again his opposition to the Trustee's previous request to surcharge the Debtor's $1,000 vehicle exemption (Main Case, Doc. No. 650).  The Trustee responded, asserting that the Debtor's $1,000 vehicle exemption had not been surcharged, but had been withheld because he had not yet complied with a previous order (Doc. No. 532) requiring turnover of a Cub Cadet riding mower (Main Case, Doc. No. 650).

[46] Order Denying Expedited Motion to Compel Compliance with Order of December 30, 2015, entered on April 11, 2014 (Main Case, Doc. No. 615).  Meanwhile, on March 4, 2014, the Supreme Court decided *Law v. Siegel*, ___ U.S. ___, 134 S.Ct. 1188, 188 L.Ed.2d. 146 (2014) (holding that a debtor's exemption may not be surcharged for administrative expenses).

[47] For example, in his post-trial response to the UST's brief in this proceeding, Debtor alleges "Judge May and Ben Lambers have witnessed three felonies committed, including perjury with attempted grand theft, and filing false information into a federal court record by Herbert Donica and Susan Woodard."  Doc. No. 169 at ¶ 12.  And, in his motion for summary judgment in AP 644, Doc. No. 80, at ¶ 21, Debtor alleged that "Susan Woodard and her attorney Herbert Donica attempted to defraud Debtor Thomas Chesley in this case by trying to collect towing fees and attorney's fees to represent the matter of the false towing fees with this court.  And, "Mr. Donica completely lied to Judge Rodney May face to face."  *Id*.  "We revisit the undisputed fact that the Chapter 7 Trustee has committed fraud against Thomas Chesley in this case."  *Id*. at ¶ 48.

[48] Trial Tr. vol. 091115, 181:13-182:9.

[49] Doc. No. 162 at 17 (citing Trial Tr. vol. 091115, 180:20-181:12, Sept. 11, 2015; 11 U.S.C. §326(a)).  Such claims would include the Trustee's statutory fee ranging from $14,250 to $15,250, $12,000 to $13,000 in fees to Mr. Steen, Debtor's former counsel. Mr. Donica testified that he has incurred fees for legal services in excess of $170,000.

[50] Trial Tr. vol. 091115, 183:22-184:9.

The Warlock Racing Boat

Debtor takes the position that he had no obligation to disclose the Warlock racing boat because, in his view, it is not property of the estate.[51]   Debtor relies on Fla. Stat. § 319.22(1) to argue that ownership requires a registered certificate of title.[52]   That statute, however, does not apply to boats.   Debtor has had possession and control of the Warlock since he purchased it in 2000.   At trial, Debtor testified that he has a "non-public deal" with his father:   if Debtor is able to get title to the boat, then he would convey it to Hammons.[53]   Debtor also testified at trial that he believed he could hire a title company to help him acquire title to the Warlock.

Contemporaneously with the ruling in this proceeding, the Court has entered judgment, in an adversary proceeding brought by the Trustee, concluding that Debtor is the beneficial owner of the Warlock and that it became property of the estate on the Petition Date.[54]

That judgment requires that the Warlock, its propeller and electronics, and outboard motor, be turned over to the Trustee for administration.   The judgment also requires turnover of the tow trailer that is under the Warlock, pending further proceedings to ascertain whether other persons may have an interest in it.

The 2002 Indian Scout Motorcycle

Contemporaneously with this ruling, the Court has entered a judgment in another adversary proceeding brought by Trustee, concluding that Debtor became the beneficial owner of the Motorcycle before the Petition Date, because he asserted as much in the papers he filed with

---

[51]   Trial Tr. vol. 092115, 215:3-14.

[52]   Doc. No. 167 at 5.

[53]   Trial Tr. vol. 092115, 221:7-222:8; Trial Tr. vol. 093015, 44:20-25, 46:3-20; 48:19-21, 59:16-60:8.

[54]   Adv. Pro. No. 8:15-ap-0474-KRM ("AP 474").   Doc. No. 174.

the Florida DMV post-petition to obtain title in his name.[55]  The judgment requires the Debtor to

turn over the Motorcycle to the Trustee for administration.

<u>Bankruptcy Schedules and Statements of Financial Affairs</u>

Multiple versions of Schedules and SOFA's were filed in this case, including:  (a) nine

sets of Schedules (Main Case, Doc. Nos. 14, 67, 131, 279, 306, 510, 597, 613, and 620) and (b)

seven SOFA's (Main Case, Doc. Nos. 14, 67, 138, 307, 596, 613, and 619).  Some of these

fillings were stricken (Main Case, Doc. Nos. 510, 596, 597, and 613), either because the filing

fee was not paid, the amendment did not contain an appropriate proof of service, or the

amendment did not comply with the Court's local rules.

The original Schedules and SOFA (Main Case, Doc. No. 14), were filed on August 11,

2011, with assistance of Attorney Galewski.  They bear only an electronic signature for Debtor;

the handwritten consent of Debtor to use an electronic signature is not in the record because no

one can find it.

These initial filings reveal inaccuracies, omissions and misleading disclosures, including,

but not limited to the following:

- Schedule A states the value of Debtor's homestead as $75,000, which was reduced in subsequent filings to $61,931.

- Item 2 of Schedule B discloses bank accounts totaling $20,000; the actual balance was then $32,198.[56]

- Item 2 omits the $340,000 being held in Attorney Chanfrau's trust  account.[57]

---

[55]  Adv. Pro. No. 8:14-ap-00644-KRM, Doc. No. 113.

[56]  Trial Tr. vol. 093015, 146:6-13.

[57]  Pl.'s Ex. 63; Trial Tr. vol. 093015, 146:6-19.

- Item 16 fails to include a $3,500 loan receivable due from Hammons.[58]

- Item 21 lists the personal injury suit against Parts Depot, but with an "unknown" value, even though the settlement proceeds had already been paid.[59]

- Item 21 fails to disclose several causes of action:  one against a Ms. LaFave (dispute over her taking possession of a  truck and other property some years earlier) and one against a Mr. Hanke  and his company, Force 10 Marine (Debtor would file suit against Mr. Hanke and  Force 10 Marine, forty-six days after the Petition Date).[60]

- Item 25 lists the value of Debtor's Truck as $45,000, even though he purchased it less than two months earlier for $63,077, subject to a lien of only about $10,000.[61]

- Item 25 fails to disclose the Motorcycle.[62]

- Item 26, regarding disclosure of boats, lists only "misc. parts;" no disclosure is made of the Warlock and related assets.[63]

- Schedule C claims as exempt 100% of the equity in the Truck, but omits any claim of exemption for Debtor's homestead.

- Schedule D falsely lists the amount of the debt on the Truck as $50,000, when the actual debt was only about $10,000.[64]

- Schedule G does not list any contract involving Debtor's "agreement" to transfer the Warlock to Hammons.[65]

---

[58] Pl.'s Ex. 203, par. II.k; Trial Tr. vol. 093015, 146:20-147:13.

[59] Pl.'s Ex. 203, par. II.a.; Trial Tr. vol. 093015, 146:20-147:18.

[60] Pl.'s Ex. 203, par. IV.a.; Trial Tr. vol. 093015, 146:20-147:21.

[61] Pl.'s Ex. 203, par. II.e.; Trial Tr. vol. 093015, 148:21-149:3.

[62] Pl.'s Ex. 176; Trial Tr. vol. 091115, 146:12-151:16; Trial Tr. vol. 093015, 150:3-8.

[63] Trial Tr. vol. 093015, 150:3-8.

[64] Pl.'s Ex. 203, par. II.e.; Trial Tr. vol. 093015, 147:24-148:19.

[65] Trial Tr. vol. 093015, 44:20-25, 46:3-20.

- Item 2 of the SOFA fails to include the receipt of settlement proceeds received from Parts Depot.[66]

- Item 3 states that only $117.00 had been paid to Greentree Financing, the holder of the foreclosure judgment on Debtor's homestead.[67]

- Item 3 fails to disclose payments to certain creditors.[68]

- Item 4 discloses the Parts Depot lawsuit as "settled," but omits the two foreclosure lawsuits involving Debtor's homestead[69] and a neighboring investment property.[70]

- Item 10 fails to list the purchase of the Truck for $63,077,[71] home improvements or repairs of at least $27,786,[72] Warlock-related expenditures of $19,782,[73] and the $3,500 loan to Hammons.[74]

- Items 3, 9, and 10 fail to list payments totaling $13,350 for legal expenses paid out of the SunTrust accounts.[75]

- Item 14 states that the only asset Debtor is holding for another person is "father's boat,"[76] without any identifying details.

When the Court first considered Attorney Galewski's motion to withdraw, at a hearing on October 19, 2011, Debtor stated that he had gone through the original schedules with Mr.

---

[66] Trial Tr. vol. 093015, 150:9-21; Pl.'s Ex. 203, par. II.a; Pl.'s Ex. 26.

[67] Pl.'s Ex. 203, par. II.f and h; Trial Tr. vol. 093015, 150:9-151:5.

[68] Pl.'s Ex. 203, par. II.d; Pl.'s Ex. 193; Trial Tr. vol. 093015, 133:6-20, 150:9-151:9.

[69] Pl.'s Ex. 109, p. 20 (Uniform Final Judgment of Foreclosure); Trial Tr. vol. 093015, 151:23-152:7.

[70] Pl.'s Ex. 74, par. 4; Pl.'s Ex. 77, par. 4; Pl.'s Ex. 199, 11:21-12:7; Trial Tr. vol. 093015, 151:23-152:7.

[71] Trial Tr. vol. 093015, 148:21-149:3, 150:9-151:15; Pl.'s Ex. 203, par. II.e.

[72] Pl.'s Ex. 193; Trial Tr. vol. 093015, 128:15-21, 151:2-22.

[73] Pl.'s Ex. 193; Trial Tr. vol. 093015, 133:21-134:21, 150:9-151:15.

[74] Pl.'s Ex. 203, par. II.k.

[75] Pl.'s Ex. 193; Trial Tr. vol. 093015, 136:3-8, 151:1-22.

[76] Trial Tr. vol. 092115, 237:15-23; Pl.'s Ex. 62, item 14.

Galewski.[77]  Judge McEwen directed Debtor to get the "schedules in a form that would be correct and representative of reality, not fiction."[78]  On December 7, 2011, Amended Schedules and an Amended SOFA were received in open court and filed (Main Case, Doc. No. 67).  Debtor signed them in open court,[79] after adding the following handwritten note:  *"I still contest any Debtors [sic] that the law contains [sic] are Illegal by face value or time has expired, not Debtors [sic] that [Attorney] Galewski says so as to owing them."*[80]

These include many of the same errors and omissions as in the initial filings, with the following exceptions:

- Item 18 of Schedule B lists the $340,000 held in Attorney Chanfrau's trust account; but there is no disclosure of the $336,644 that the Debtor had received directly from the settlement.

- Item 3 of the SOFA corrected the amount of the payment to Greentree Financing to $117,000.

On May 7, 2012, the Second Amended Schedules (Main Case, Doc. No. 131) and First Amended SOFA (Main Case, Doc. No. 138) were filed, with assistance of Attorney Hancock. These filings also bear Debtor's handwritten signature, on page 38 of 45.  The principal differences from the prior filings are:

- Debtor's homestead is stated to have a value of $61,931.[81]

- Items 1 and 2 of Schedule B omit disclosure of any cash or deposits.

---

[77]  Pl.'s Ex. 198, 6:2-25.

[78]  Pl.'s Ex. 198, 7:23-8:8.

[79]  Pl.'s Ex. 12; Trial Tr. vol. 092115, 142:20-144:2; Main Case, Doc. No. 67.

[80]  Main Case, Doc. No. 67 at 1.

[81]  Pl.'s Ex. 18, Schedule A.

- Item 26, regarding disclosure of boats, omits disclosure of the Warlock, as well as the "misc. parts" previously listed.

- Item 25 states the value of the Truck as $45,000.

- Schedule C is the same as in the prior filing.

- Item 14 of the SOFA (filed one week after Debtor had received a title certificate in his own name) discloses Debtor's possession of the Motorcycle: *"Father's motorcycle, Debtor transferred title in order to have insurance to operate, to save on fuel costs"* Location is stated to be: "Debtor's Residence."

On November 8, 2012, the Third Amended Schedules (Main Case, Doc. No. 279) were filed while Debtor was represented by Attorney Hancock. The Amended Schedules include Debtor's handwritten signature and this declaration:

> *"Not responsible for mistakes in preparing these schedules by my attorney. Only provided for amendments in Summary, Schedule B, Schedule C."*[82]

The principal difference from prior filings are:

- Items 1 and 35 of Schedule B disclose, for the first time, the total monies received from the Parts Depot settlement.

- Schedule C claims all of the settlement proceeds as exempt.[83]

On January 9 and 10, 2013, respectively, the Fourth Amended Schedules (Main Case Doc. No. 306) and Third Amended SOFA (Main Case, Doc. No. 307) were filed while Debtor was represented by Attorney Hancock. Debtor signed each of the documents. The disclosures are substantially the same as in the prior filings, except:

- Item 28 of Schedule B lists, for the first time, a "TNT trailer,

---

[82] Main Case, Doc. No. 279 at 11.

[83] "Suntrust Account No. 2193 ($32,399.64); 2011 Ford F[-]450 SD ($45,000.00); [Debtor's counsel's] trust account ($340,000.00); proceeds from personal injury lawsuit identified as lost wages ($695,000.00); proceeds from personal injury lawsuit identified as past medical expenses ($80,000.00); proceeds from personal injury lawsuit identified as future medical expenses ($420,000.00); proceeds from personal injury lawsuit identified as past lost wages or earning ability ($130,000.00)."  Main Case, Doc. No. 306 at 9-11.

28-30 adjustment hauler" located at Debtor's home, having a stated value of $2,000.

- Item 26, regarding disclosure of boats, states only "miscellaneous parts."

- Item 14, to the Amended Statement of Financial Affairs regarding property held for another person discloses the "Motorcycle" but the owner is stated to be "*Debtor's father TN*" and   the property is described as:  "*2002 Indian Scout; 8,600 miles; Debtor transferred title in order to have insurance to operate, to save on fuel costs; Debtor has no right to sell or trade.*"

On April 14, 2014, Debtor filed his Fourth Amended SOFA (Main Case, Doc. No. 619) and Fifth Amended Schedules (Main Case Doc. No. 620) in the Chapter 7 case.  These are the last disclosure filings made in the case, more than 32 months after the Petition Date.[84]  These filings are signed by Debtor and repeat the same omissions and inaccuracies as noted above:

- Item 16 of Schedule B fails to disclose the $3,500 loan receivable due from Hammons.[85]

- Item 21 fails to disclose the causes of action against Mr. Hanke and Force 10  Marine.[86]

- Item 25 lists the value of the Truck as $45,000.[87]

- Item 28 omits any reference to the "TNT trailer" that was listed in the January 2013 filing.

- Item 25 fails to disclose the Motorcycle.[88]

- Item 26 fails to disclose the Warlock and Warlock-related equipment.[89]

---

[84] Main Case, Doc. Nos. 619 and 620; Pl's Exs. 62 and 63.

[85] Pl.'s Ex. 203, par. II.k; *cf.* Trial Tr. vol. 093015, 152:12-21.

[86] Pl.'s Ex. 203, par. IV.a; *cf.* Trial Tr. vol. 093015, 152:12-25.

[87] Pl.'s Ex. 203, par. II.e; *cf.* Trial Tr. vol. 093015, 148:21-149:3.

[88] Pl.'s Ex. 176; *cf.* Trial Tr. vol. 091115, 146:12-151:16; Trial Tr. vol. 093015, 152:12-153:3.

[89]  *Cf.* Trial Tr. vol. 093015, 152:12-153:3.

- Item 3 of the Amended SOFA omits the $116,655 debt repayment to Greentree Financing.[90]

- Item 4 fails to include the foreclosure lawsuit involving an investment property.[91]

- Item 8 does not disclose any theft of the tow trailer, that is no longer listed in the Schedules.

- Item 14 does not disclose that Debtor is holding a tow trailer for another person.

- Item 10 fails to list the purchase of the Truck for $63,077,[92] boat-related expenditures of $19,782,[93] and the $3,500 loan to Hammons.[94]

- Items 3, 9, and 10 of the SOFA fail to list all of the payments for legal expenses out of the SunTrust accounts totaling $13,350 (only listing payments to Attorney Galewski and for debt counseling, totaling $1,600).[95]

DISCUSSION

## I.   <u>Preliminary Matters</u>

Nearly three months before trial, the Court granted the UST's Second Motion in Limine barring Debtor from raising at trial the defense of inadequate counsel.[96]  At the hearing on June 2, 2015, Debtor did not oppose the relief requested.

---

[90] Pl.'s Ex. 203, par. II.f and h; Trial Tr. vol. 093015, 162:9-15.

[91] Pl.'s Ex. 74, par. 4; Pl.'s Ex. 77, par. 4; Pl.'s Ex. 199, 11:21-12:7; *cf.* Trial Tr. vol. 093015, 157:24-158:3.

[92] Trial Tr. vol. 093015, 148:21-149:3, 162:9-19; Pl.'s Ex. 203, par. I.e

[93] Pl.'s Ex. 193; Trial Tr. vol. 093015, 162:9-163:1.

[94] Pl.'s Ex. 203, par. II.k.

[95] Pl.'s Ex. 193; Trial Tr. vol. 093015, 136:3-8; *cf.* Trial Tr. vol. 093015, 151:1-22.

[96] Doc. No. 102.

None of Debtor's attorneys were called to testify at trial.  But, in his post-trial brief, Debtor asserts:

> *"Any issues of what and how things were filed in this bankruptcy case, are questions for the attorney's* [sic] *that filed them, not for Mr. Chesley.  Mr. Chesley cannot explain why the attorneys filed them, the way they did."*[97]

According to Debtor, his attorneys were responsible for the content of his Schedules and SOFA's.[98]  He maintains that he had no obligation or opportunity to review them.  Debtor also claims that he was provided with the prepared document by his bankruptcy counsel at the time and that he was only ever provided a signature page.[99]

The Court concludes, however, that Debtor is barred from blaming his attorneys for the pattern of substantial omissions and misleading disclosures made in his Court filings.  First, this proceeding was tried after entry of the order, to which Debtor consented, barring him from blaming his lawyers.  Second, the record refutes any such shifting of blame.  Debtor hand-signed at least four sets of schedules[100] and four SOFA's[101] attesting under the penalties of perjury, that the information was true and correct to the best of his knowledge, information, and belief.  Debtor was advised by Judge McEwen early in the Chapter 13 case that his initial filings were inaccurate.  He knew that the Warlock and Warlock-related assets, for example, were not disclosed.

---

[97]  This is how the debtor, Thomas Chesley, views the bankruptcy schedules and statements of financial affairs filed in his case.

[98] Debtor argues in his post-trial brief that: "Numerous attorney's [sic] failed to properly file schedules, follow court orders to amend and file schedules in a required time, failed to allow client to review all schedules before filing, failed to address State of Florida garnishment of Mr. Chesley's bank accounts, and all issues of which were in common knowledge by the court and all parties."  Doc. No. 167 at ¶ 23.

[99]  Doc. No. 169 at ¶ 28.

[100]  Main Case, Doc. Nos. 131, 279, 306, and 620.

[101]  Main Case, Doc. Nos. 131, 138, 307, and 619.

A debtor has an obligation, independent of his attorney, to review and assure that the schedules and statements of financial affairs are accurate and complete, as attested.[102]  Debtor cannot now disclaim responsibility for the statements which he made under oath.  Debtor is personally responsible for the cumulative omissions and misleading disclosures filed in this case.

## II.       11 U.S.C. § 727(a)(2) – Transfer or Concealment of Assets to Hinder, Delay or Defraud Creditors

Section 727(a)(2) permits denial of discharge if "the debtor, with intent to hinder, delay or defraud a creditor, . . . has transferred . . . or concealed . . .  property of the debtor, within one year before the filing of the petition," or property of the estate after the filing of the petition.[103] The required intent to hinder, delay or defraud creditors may be inferred from circumstantial evidence,[104] such as the failure to make a full disclosure of material liabilities or assets.[105]

Because intent can seldom be established by direct evidence, courts may infer a debtor's fraudulent intent from the surrounding facts and circumstances, such as:[106]

> (i)  the lack of adequate consideration for the transfer; (ii) the family, friendship, or close relationship between the parties; (iii) the retention of possession, benefit, or use of the property in question by the debtor; (iv) the financial condition of the party sought to be charged prior to and after the transaction in question; (v) the conveyance of all of the debtor's property; (vi) the secrecy of the conveyance; (vii) the existence or cumulative effect of the pattern or series of transactions or course of conduct after the

---

[102]  *In re Hendrix*, 352 B.R. 206, 208 (Bankr. W.D. Mo. 2006) (court stated that even if debtor claimed she was not fully advised by counsel of the need to fully disclose her assets and liabilities, the court would "disgrard the assertion as irrelevant given that [d]ebtor has an independent obligation to fully review the schedules and statements, which themselves advise of the need for complete disclosure by requiring that a debtor sign a declaration that they are true and correct under penalty of perjury.").

[103]  *See In re Sofro*, 110 B.R. 989, 991 (Bankr. S.D. Fla. 1990).

[104]  *In re Windgate*, 377 B.R. 687 (Bankr. M.D. Fla. 2006) (quoting *In re Zwirn*, 2005 WL 1978510, * 3 (Bankr. S.D. Fla.); *see also In re Moeritz,* 317 B.R. 177, 182 (Bankr. M.D. Fla. 2004)).

[105]  *See In re Sofro*, 110 B.R. at 991; *In re Matus*, 303 B.R. 660, 672–73 (Bankr. N.D. Ga. 2004) (citing *In re Vina,* 283 B.R. 803, 808 (Bankr. M.D. Fla. 2002)).

[106]  *In re Matus*, 303 B.R. at 672.

incurring of debt, onset of financial difficulties, or pendency or threat of suit by creditors; and (viii) the general chronology of the events and transactions under inquiry.[107]

"In addition to these 'badges of fraud,' the conversion of non-exempt assets to exempt assets can be evidence of intent to hinder, delay or defraud.[108]

<u>Transfer of Property with Intent to Hinder, Delay, or Defraud</u>

In a two-month period, Debtor expended an extraordinary sum of money, nearly $305,000, to satisfy the foreclosure judgment on his homestead, improve or repair his home, pay some of his creditors, purchase consumables, and purchase assets in furtherance of his boat racing activities, as described above.  Debtor takes the position that none of this was done with fraudulent intent because he only made repairs to his home, not "improvements," and paying doctors, trial witnesses and medical bills in his lawsuit, saving his home from foreclosure, and repairing his home from water and fire damage were ordinary expenses in his circumstances.

Debtor used $117,000 of the settlement proceeds to satisfy the foreclosure judgment and between $28,000 and $38,000 making repairs or improvements to his homestead.[109]  In other words, Debtor transferred between $144,000 and $154,000 of non-exempt assets into the exempt homestead, even though the home was worth no more than $62,000 after all of the expenditures were made.[110]  The UST argues that these expenditures were transfers of property made with the

---

[107]  *In re Matus*, 303 B.R. at 672–73 (citing *In re Vina,* 283 B.R. at 808).

[108]  *In re Chauncey*, 308 B.R. 97, 104 (Bankr. S.D. Fla. 2004) (citing *In re Wilbur,* 211 B.R. 98 (Bankr. M.D. Fla. 1997).

[109]  At trial, the UST identified that Debtor spent approximately $27,786 on repairs and improvements, while Debtor testified that he spent $38,000, but insisted they were all "repairs."  Doc. No. 162 at 4-5 (citing Pl.'s Ex. 193; Trial Tr. vol. 093015, 128:15-21; Trial Tr. vol. 092115, 177:14-178:5).

[110]  *In re Tabone*, 247 B.R. 541 (Bankr. M.D. Fla. 2000); *In re Segal*, 308 B.R. 97 (Bankr. S.D. Fla. 2009)(citing *In re Levine*, 134 F.3d 1046 (11th Cir. 1998).

intent to hinder, delay or defraud creditors.[111]  The UST argues that such intent may be inferred

from the waste inherent to investing approximately $150,000 in a home worth only $62,000,

which Debtor now owns free and clear.

In *In re Chauncey*,[112] one of debtor's creditors obtained a judgment against her; one

month later, she settled a personal injury claim for $80,000.  The debtor directed her lawyer to

transfer the settlement proceeds to pay down her mortgage because she knew that her home

would be protected from creditors.  The bankruptcy court found that the debtor delayed filing for

bankruptcy until the settlement proceeds were out of the reach of creditors.[113]  The Eleventh

Circuit upheld the bankruptcy court's denial of debtor's discharge based on her transfer, by the

conversion of non-exempt assets into exempt assets, within one year before filing her petition

with intent to hinder, delay or defraud creditors.

In this case, Debtor already had judgments entered against him when he received the

settlement proceeds.  He was facing a writ of garnishment by creditor Beahan.[114]  A final

judgment on Beahan's writ of garnishment against the settlement proceeds was entered on July

20, 2011.  By that time, Debtor had satisfied the foreclosure judgment and made the repairs to his

home.  Debtor filed his Chapter 13 petition the next day.[115]  Debtor eventually claimed his

homestead property as exempt.[116]

---

[111]  Doc. No. 1 at 14-15; Doc. No. 162 at 18-19.

[112]  454 F.3d 1292 (11th Cir. 2006).

[113]  *In re Chauncey*, 308 B.R. at 105-06.

[114]  Doc. No. 162 at 6.

[115]  *Id.* (citing Pl.'s Ex. 178; Trial Tr. vol. 091115, 80:22-82:24).

[116]  Doc. Nos. 131, 279, 306, and 510.

The Court has considered the fact that Debtor suffered major injuries from his 2005 accident; he was not fully employed and was facing the loss of his home through foreclosure. The Court accepts the essential point of Debtor's explanation – he was preserving a place to live in light of uncertainty.  But, Debtor could have used a portion of the funds to reinstate his home mortgage in Chapter 13.  Instead, he put $144,000 to $154,000 beyond the reach of Mr. Beahan and his other creditors and now owns his home free and clear.

Based on these facts, the Court concludes that Debtor transferred a substantial amount of non-exempt settlement proceeds into his exempt homestead, on the eve of having the settlement proceeds garnished, and with knowledge that the proceeds would be protected from his creditors.  Accordingly, the Court concludes that Debtor's discharge should be denied under § 727(a)(2)(A).

Concealment of Assets

The evidence is compelling that Debtor concealed assets during the case, including the equity in his Ford F-450 truck, his long-time possession and use of the Warlock, and the outboard motor, tow trailer, and the Motorcycle purchased in the two months before the Petition Date.  Even if Debtor did not review or comprehend his initial Schedules and SOFA, he was advised by the Court on October 19, 2011, of problems inherent to the initial filings.  From that point on, Debtor was on notice that he was responsible for the accuracy of these documents.  But, Debtor never corrected the disclosures regarding the Truck, the Warlock, the Warlock-related assets or the Motorcycle, which effectively concealed them from the bankruptcy estate.[117]

In this proceeding, Attorney Campbell, who represented Mr. Beahan, testified credibly about an earlier deposition of Debtor taken in the state court collection action:  at that time,

---

[117] Doc. No. 162 at 6 (citing Pl.'s Ex. 178; Trial Tr. vol. 091115, 80:22-82:24).

Debtor falsely testified that he had sold the Warlock in 2005.[118]  At trial in this proceeding,

Debtor disputed that he had given such prior testimony.[119]  In any event, it is clear from Attorney

Campbell's credible testimony that Debtor actively opposed Beahan's collection efforts.

With the assistance of Attorney Campbell, the Trustee discovered the undisclosed assets

and set about recovering them.  Debtor has opposed all of the Trustee's efforts and has done so

based on unsound and contradictory legal positions:

(1)  Debtor claimed that all of the settlement proceeds were exempt "disability income benefits," which was rejected by this Court and the District Court on appeal.[120]  In this proceeding, Debtor reargues the exemption issue, this time asserting that his pre-petition expenditures were made with exempt "life insurance proceeds."[121]  There is no evidence of any life insurance policy as the source of Debtor's cash.[122]

(2)  Debtor has simultaneously claimed that he does not "legally" own the Motorcycle because he did not have registered title; but he also argues that his father is the owner, even though he does not hold registered title either. Even after Debtor had obtained the registered title to the Motorcycle, Debtor disclosed only that he was holding the Motorcycle for his father.

(3)  Debtor has taken the position that Fla. Stat. § 319.22(1) shields him from having to disclose or turn over the Warlock, even though he has had possession and control of the boat since 2000 and the statute he cites does not apply to boats.

(4)  Debtor purchased a tow trailer shortly before filing, but now claims it was stolen sometime during the case and replaced with another one that is owned by a third person; but, neither the theft, nor the Debtor's possession of someone else's trailer was ever disclosed.  Debtor's delayed disclosure of a "TNT trailer," in the amended Schedules filed eighteen months after the

---

[118]  Doc. No. 162 at 3 (citing Trial Tr. vol. 091115, 74:1 – 80:18).

[119]  Trial Tr. vol. 091115, 74:13 – 75:6.

[120]  Main Case, Doc. No. 603-2.

[121]  Doc. No. 167 at 15 (arguing that boat related expenses were paid with "personal injury funds that are life insurance proceeds and are exempt completely.").

[122]  There is no mention of "life insurance" in the District Court's Order affirming this Court's denial of Debtor's claim of exemptions.  Main Case, Doc. No. 603-2.

Petition Date, facilitated his goal of making the Trustee's recovery more difficult.

The breadth and pattern of Debtor's non-disclosures go far beyond mistakes that can now be excused.  Taken together, the cumulative omissions, the misleading disclosures (e.g., "misc. parts," "father's boat"), the material values of the undisclosed assets, and Debtor's intense opposition to relinquishing any of them leads to the conclusion that Debtor acted deliberately to conceal them, with the requisite intent to hinder, delay or defraud his creditors and the bankruptcy estate.  The Court concludes that because of the concealment, Debtor's discharge should be denied under § 727(a)(2).

### III.        11 U.S.C. § 727(a)(3) – Failure to Keep or Preserve Books or Records

The discharge may be denied if a debtor has "concealed, destroyed, mutilated, falsified, or failed to keep or preserve any recorded information, including books, documents, records, and papers, from which the debtor's financial condition or business transactions might be ascertained, unless such act or failure to act was justified under all of the circumstances of the case."[123]

It is apparent that Debtor did not respond to the Chapter 13 trustee's request for documents verifying his sources of income.  But, the consequence of failing to cooperate with the Chapter 13 trustee is not denial of a Chapter 7 discharge, it is denial of plan confirmation, coupled with dismissal or conversion of the case to Chapter 7.[124]  The UST has not proven that Debtor failed to keep records or has destroyed or falsified any of his records.  Accordingly, the discharge will not be denied under § 727(a)(3).

---

[123]  The elements of proof are:  (1) that the debtor failed to maintain and preserve adequate records, and (2) that such failure makes it impossible to ascertain the debtor's financial condition and material business transactions.  *In re Sadler*, 282 B.R. 254, 263 (Bankr. M.D. Fla. 2002) (quoting *Meridian Bank*, 958 F. 25 1226, 1232 (3d Cir. 1992)).

[124]  11 U.S.C. § 521(i)(1) and (2).

### IV.        11 U.S.C. § 727(a)(4) – False Oath or Account

The Chapter 7 discharge is premised on a debtor giving creditors and the trustee complete and accurate information of the debtor's financial affairs.[125]  "Even if undisclosed assets are worthless or unavailable to creditors, a debtor has an obligation to make full disclosure."[126]

Accordingly, the Chapter 7 discharge may be denied if:  (1) the debtor made a material statement under oath knowing it was false, and the statement was made with fraudulent intent.[127] A false oath is "material" if it concerns the discovery of assets, business dealings, or the existence and disposition of property.[128]  The bankruptcy schedules and the SOFA require attestation by a debtor that they are true and correct.  This attestation is itself a false oath if there are known and material omissions from these documents.[129]  The requisite intent may be inferred from a showing that the debtor engaged in a pattern of concealment[130] or that the debtor had a reckless indifference for the truth.[131]

---

[125]  *In re Sadler*, 282 B.R. at 263 (citing *PNC Bank v. Buzzelli (In re Buzzelli),* 246 B.R. 75, 95 (Bankr. W.D. Pa. 2000)).

[126]  *In re Urban*, 130 B.R. 340, 344 (Bankr. M.D. Fla. 1991) (citing *Chalik v. Moorefield* (*In re Chalik),* 748 F.2d 616 (11th Cir. 1984)).

[127]  *In re Perry*, 252 B.R. 541, 549 (Bankr. M.D. Fla. 2000).

[128]  *In re Caserta*, 182 B.R. 599, 607 (Bankr. S.D. Fla. 1995) (citing *In re Chalik*, 748 F.2d at 618).

[129]  "Omissions from a debtor's sworn statement of affairs or schedules provide grounds for denying discharge."  *In re McElroy*, 229 B.R. 483, 488 (Bankr. M.D. Fla. 1998) (citing *In re Chalik*, 748 F. 2d at 618).  "The [d]ebtor's signature on the Petition, the Schedules of Assets and Liabilities and Statement of Financial Affairs, verified and made under penalty of perjury pursuant to Rule 1008, are declarations which have the force and effect of oaths of the kind encompassed by the discharge exception for making a false oath.  *In re Bren*, 303 B.R. 610, 613 (8th Cir. BAP 2004), *rev'd on other grounds, In re Bren,* 331 B.R. 797 (8th Cir. BAP 2005).

[130]  *In re Eigsti*, 323 B.R. 778, 784 (Bankr. M.D. Fla. 2005) (citing *In re Leffingwell*, 279 B.R. 328, 350 (Bankr. M.D. Fla. 2002)).

[131]  *Id.*  Multiple inaccuracies in a debtor's petition and bankruptcy schedules taken cumulatively evidences a cavalier disregard for the truth serious enough to supply the necessary fraudulent intent required by § 727(a)(4)(A). *In re Walden*, 380 B.R. 883, 893 (Bankr. M.D. Fla. 2008) (citing *In re Unger*, 333 B.R. 461, 468 (Bankr. M.D. Fla. 2005)); *In re Leffingwell*, 279 B.R. at 351 (quoting from *In re Hatton*, 204 B.R. 477, 484 (Bankr. E.D. Va. 1997)).

There is a pattern of material omissions and false or misleading disclosures throughout this case, much of which served the purpose of concealing material assets from the Trustee. Debtor never disclosed his possession of the Warlock, or the purchases of Warlock-related assets shortly before the Petition Date.  In his several responses to Item 26 in Schedule B, which asks for disclosure of "boats, motors and accessories," Debtor stated either "misc. parts" or nothing at all.  In the first two SOFA's, filed in 2011, Debtor disclosed that he was holding in his possession an asset described only as "father's boat."[132]  He made no mention of the Motorcycle until May 2012, after he had secured title in his own name; but, even though he was then the registered title holder, Debtor disclosed only that he was holding his "father's motorcycle."[133] He made only one long-delayed disclosure of a "TNT Trailer," without providing any identifying details, which facilitated Debtor's claim the trailer he has now is a different one that is owned by someone else.  Debtor's schedules initially listed the value of his personal injury claim as "unknown," even though the settlement had been concluded and Debtor had already deposited approximately $336,644 into his bank accounts.  Debtor waited months to disclose the full amount of that settlement.

These omissions and false or misleading statements have greatly burdened the administration of both the Chapter 13 and Chapter 7 cases.  Debtor has taken various unsustainable legal positions, as discussed above, and has done so with uncivil, *ad hominum* attacks on the Trustee and Trustee's counsel.

---

[132]  Statement of Financial Affairs, filed August 11, 2011 (Main Case, Doc. No. 14, p. 28 ¶ 14); Statement of Financial Affairs, filed December 7, 2011 (Main Case, Doc. No. 67, p. 13, ¶ 14).

[133]  *See, e.g.*, Item 14 of SOFA filed on May 7, 2012 (Main Case, Doc. No. 131 at 26).

Debtor has shown a reckless indifference for the truth, from his inadequate response to Judge McEwen's advice in October 2011, to get the disclosures in order and from the note he added to his filings a year later:

> *"Not responsible for mistakes in preparing these schedules by my attorney. Only provided for amendments in Summary, Schedule B, Schedule C."*[134]

Debtor knew his disclosures were false, but instead of correcting them, he proclaimed his own exculpation while taking advantage of his lack of disclosure.

For example, Debtor utilized the Trustee's ignorance of the undisclosed matters to compound the Trustee's burdens.  In the Trustee's adversary proceeding to recover the Warlock, Debtor filed a request for documents that either do not exist or would likely be in Debtor's possession:[135]

> *"Defendants acting pro se hereby requests the following from the [Trustee]:*
>
> *1.      Please provide title to Warlock vessel, that was titled in the Debtors name prior to the petition date (you can jibber jabber about anything else but the title in Mr. Chesley's name is what is required by law in this matter).*
>
> *2.      Please provide the registration in Mr. Chesley's name for the trailer that is under the Warlock, make sure it includes serial and registration numbers in Mr. Chesley's name (you can jibber jabber about anything else but the registration in Mr. Chesley's name is what is required by law in this matter).*
>
> *                                   * * **
>
> *3.      Please provide the information about the racing engine including the receipts for purchase of the parts, machine work to assemble and what date Mr. Chesley acquired that motor.*
>
> *4.      If your [sic] too broke to afford to send this information please let Mr. Chesley know and he will get you the $2.00 needed to do so."*

---

[134] Main Case, Doc. No. 279 at 11.

[135] AP 474, Doc. No. 44.

Based on this set of facts, the Court concludes that the UST has met its burden of establishing the necessary elements to deny the Debtor a discharge under § 727(a)(4).

**V.        11 U.S.C. § 727(a)(5) – Failure to Explain Loss of Assets**

The Chapter 7 discharge may be denied if "the debtor has failed to explain satisfactorily, before determination of denial of discharge under this paragraph, any loss of assets or deficiency of assets to meet the debtor's liabilities."   This promotes the policy of full disclosure by requiring debtors to adequately explain their insolvency.[136]  The debtor's explanations "must be supported by some corroboration," and "must be sufficient to eliminate the need for any speculation as to what happened to all of the assets."[137] "Vague and indefinite explanations of losses that are based on estimates uncorroborated by documentation are unsatisfactory."[138]

UST has established that Debtor failed to account for $245,060 of the $304,446 that he expended within the two months before the Petition Date.  UST correctly asserts that Debtor failed to explain satisfactorily how he spent such large sums of money on the eve of bankruptcy.  A great deal of effort has been expended by others to ascertain, in the absence of Debtor's forthright disclosure, the pre-petition acquisition of assets and what happened to those assets during the case.

Debtor contends that he satisfied his obligation by turning over bank statements to the Trustee.  It is not the responsibility of either the UST, the Trustee or a creditor to sift through documents to piece together a debtor's financial history.[139]  As noted above, Debtor's explanations and positions throughout the case have been vague, indefinite, inconsistent and

---

[136]  *In re Dubovoy*, 377 B.R. 705, 712 (Bankr. M.D. Fla. 2006) (citing *In re Perry*, 252 B.R. at 549).

[137]  *Id.* at 712 (quoting *In re Aoki,* 323 B.R. 803, 817 (1st Cir. BAP 2005).

[138]  *Id.* (quoting *In re Perry,* 252 B.R. at 550) (quoting *In re Chalik,* 748 F.2d at 619).

[139]  *In re Shahid*, 334 B.R. 698, 707 (Bankr. N.D. Fla. 2005) (citing *Matter of Juzwiak*, 89 F. 3d 424 (7th Cir. 1996)).

misleading.  Because Debtor has not satisfactorily explained his expenditures, and loss of the tow

trailer, the discharge will be denied under § 727(a)(5).

## VI.    Related Matters

On September 14, 2015, Debtor elected not to appear for the second day of trial in this

adversary proceeding.  Instead, he filed a motion for "involuntary dismissal."[140]  At a hearing on

September 21, 2015, the Court denied the amended motion in open court and the trial resumed;

on the same day, the Debtor filed an "amended" version of the motion, raising the same

arguments.[141]

Debtor proclaims that the UST is implicitly challenging the constitutionality of Fla. Stat.

§ 319.22(1), which requires (with a certain relevant exception) a certificate registered with the

Florida DMV in order to have marketable title of a motor vehicle.[142]  Debtor contends that any

ruling by this Court that he owned the Motorcycle or Warlock on the Petition Date is a

"refutation" of Fla. Stat. § 319.22, which he characterizes as a constitutional challenge.  In turn,

Debtor contends that the UST has failed to comply with Fed. R. Civ. P. 5.1, which requires a

party challenging the constitutionality of a state statute to serve notice and papers on the State's

Attorney General and that this Court has failed to comply with the rule because it has not

---

[140]  Doc. No. 125, amended at Doc. No. 132.  The motion is captioned:  *"Debtors Amended Motion for Involuntary Dismissal and Notice to the Court, to the Court Record, and All Parties, of Defendants Notice to Florida State Attorney General Pam Bondi, of the Court and All Parties, Including Witnesses Evasive Actions of Concealment of a Constitutional Challenge and The Supreme Courts Doctrine Identifying the Challenge Under FRCP 5.1(a)(b), the Courts Evasive Concealment of Requirement FRCP 5.1(b), 28 U.S.C. § 2403(b), the Courts Failure to Recognize Lack of Jurisdiction Under FRCP 5.1(c) to Enter a Final Order Refuting, F.S. 319.22(1) or to Reject the Constitutional Challenge Without Notice to the State Attorney Generals Office, the Courts Intent to Enter a Final Judgment in an Adversary Proceeding Regarding F.S. 319.22(1) and the Constitutional Challenges by the Plaintiff's and Attorney's, the Plaintiff's and Plaintiff's Attorney's Failure to Follow FRCP 4(m), Failure to Follow FRCP 19(a)(1)(A), FRCP (a)(1)(B)(i)."*

[141]  Doc. No. 137.

[142]  According to Debtor:  "The only way to attempt to make a claim when every **court in the State of Florida** is **barred** by **F.S. 319.22(1),** would be to **challenge** the **constitutionality** of the **statute** or the validness, which is the constitutionality challenge, if in the end result the plaintiff is claiming to refute F.S. 319.22(1) completely."  Doc. No. 137 at ¶ 18 (emphasis in original).

certified the constitutional challenge to the State's Attorney General, as required by 28 U.S.C. § 2403. Therefore, Debtor maintains, this proceeding must be dismissed.

Debtor's claim of a constitutional challenge is unfounded. The UST has not asked the Court to overturn Fla. Stat. § 319.22(1), or any other provision of state law. This adversary proceeding concerns only the issue of whether Debtor's conduct, before and during this case, falls within the proscriptions of § 727(a)(2)-(5). As discussed above, Fla. Stat. § 319.22(1) has no bearing on any of the issues in this proceeding.

Second, Debtor filed a motion for summary judgment, after the conclusion of the trial.[143] The UST filed a response, arguing that Debtor's motion should be denied as untimely filed.[144] Because Debtor's motion was filed before written post-trial submissions were to be filed, the Court deems it appropriate to deny the motion.

## CONCLUSION

Although the provisions of the Bankruptcy Code which permit denial of the Chapter 7 discharge are to be construed liberally in favor of the debtor,[145] there is particularly egregious conduct by Debtor in this case. For years, Debtor has failed to disclose, or has given only incomplete or misleading disclosures about, assets he intensely wants to keep. There is a pattern of deliberate concealment and a reckless indifference for the truth that cannot be excused as mistakes by Debtor or his attorneys. Debtor made false oaths and transferred and concealed assets, all with the intent to hinder, delay or defraud his creditors. Debtor thereby prolonged his possession and use of these assets and burdened the administration of the bankruptcy estate.

---

[143] Doc. No. 151, amended at Doc. No. 163.

[144] Doc. No. 165.

[145] *In re Jennings*, 349 B.R. 897, 909 (Bankr. M.D. Fla. 2006) (citing *Cohen v. McElroy (In re McElroy),* 229 B.R. 483, 487 (Bankr.M.D.Fla.1998)).

Therefore, it is appropriate to enter judgment denying Debtor's Chapter 7 discharge.

Accordingly, for the reasons set forth above, it is hereby:

ORDERED that the Debtor's Chapter 7 discharge will be denied pursuant to § 727 (a)(2), (4), and (5).

Clerk's Office to Serve.